UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BETH JEANRILL L. DINSAY, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 1:19-cv-00907-TWP-DML ) |
| RN STAFF INC., | ) ) ) |
| Defendant. | ) |

**FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND RULING FOLLOWING BENCH TRIAL**

This matter is before the Court following a bench trial on Plaintiff Beth Jeanrill L. Dinsay's ("Dinsay") claim against Defendant RN Staff Inc. ("RN Staff") for violation of the Trafficking Victims Protection Act, 18 U.S.C. § 1589 ("TVPA"). On October 4, 2018, Dinsay filed her Complaint asserting two claims against RN Staff—violation of the TVPA and violation of 26 U.S.C. § 7434 ([Filing No. 1 at 18](Filing No. 1 at 18)–19). After more than two years of litigation activity, the parties filed cross-motions for summary judgment, which the Court denied, and Dinsay voluntarily dismissed her claim against RN Staff for violation of 26 U.S.C. § 7434 ([Filing No. 80 at 11](Filing No. 80 at 11)). This matter then proceeded to a bench trial on November 22, 2021, on the TVPA claim. The Court, having heard testimony and received evidence, now issues the following findings of fact, conclusions of law, and ruling.

**I.   FINDINGS OF FACT**

Dinsay, a citizen of the Philippines, is a physical therapist by training and education. She graduated with a bachelor's degree in physical therapy from Silliman University in the Philippines in March 2005. After graduation, Dinsay practiced physical therapy in the Philippines for approximately seven years until November 2012. In December 2012, Grandison Management, Inc.

offered to sponsor Dinsay to work in the United States as a nonimmigrant H-1B physical therapist. After approval of the H-1B petition and the issuance of her H-1B nonimmigrant visa, Dinsay lawfully entered the United States in January 2013 to work as a physical therapist. Dinsay worked for Grandison Management for approximately three years. Dinsay now lives in New York where she is licensed to practice physical therapy (Filing No. 122 at 24–27).

RN Staff is an Indiana corporation that maintains offices in Indianapolis and does business as Rehability Care. It is engaged in the business of hiring physical therapists and then providing those physical therapists to health care facilities and organizations throughout the country (Ex. 102 at 1).

In November 2015, RN Staff recruited Dinsay by communicating with her in New York and offering her green card sponsorship and employment. RN Staff recruited Dinsay by telling her that it would immediately file her Form I-140 immigrant petition rather than sponsoring her as a nonimmigrant H-1B employee. RN Staff promised Dinsay that it would sponsor her as a physical therapist under the EB-2 immigrant worker category, which requires the worker to have at least a master's degree or five years of relevant experience as a physical therapist. At that time, Dinsay had a bachelor's degree in physical therapy and more than five years of relevant experience (Filing No. 122 at 27–29; Ex. 101 at 3–4; Ex. 102 at 1).

On November 9, 2015, Dinsay and RN Staff executed an employment agreement, wherein RN Staff agreed to sponsor Dinsay for an employment-based visa, and it would complete and submit the United States Citizenship and Immigration Services ("USCIS") paperwork on behalf of Dinsay. RN Staff agreed to employ Dinsay for 4,160 hours with the expectation of providing her with thirty-five to forty hours of work each week. The employment agreement specified that Dinsay would be compensated $1,100.00 net per week based on a forty-hour work week as well

as other employment benefits (Ex. 102 at 1–5). RN Staff and Dinsay engaged in negotiations concerning her employment contract and how she would be paid. She was presented various options for compensation: paid hourly, paid per diem, or net pay. Dinsay chose to be paid net pay because this would allow her to get more money, and her choice was reflected in her employment contract (Filing No. 122 at 137).

In January 2016, RN Staff filed a Form I-140 immigrant petition on behalf of Dinsay whereby the position offered was that of an EB-2 category. In filing the EB-2 Form I-140 petition on behalf of Dinsay, RN Staff represented to USCIS that it would pay Dinsay at least the prevailing wage rate for the offered position (Ex. 108 at ¶¶ 7–8; Ex. 106 at 8–13). Before RN Staff filed the EB-2 Form I-140 immigrant petition on behalf of Dinsay, RN Staff researched how much the prevailing wage rate was for the EB-2 position offered to Dinsay at her anticipated worksite.[1] RN Staff assisted Dinsay in the simultaneous filing of Dinsay's Form I-485 adjustment application and Form I-765 employment authorization application (Ex. 108 at ¶¶ 12–13; Filing No. 122 at 30).

Dinsay began her employment with RN Staff on March 25, 2016. RN Staff initially assigned Dinsay to work at an out-patient clinic in Brooklyn, New York. In November 2016, RN Staff reassigned Dinsay to work as a physical therapist in Freeport, New York. Around this same time, USCIS issued a request for evidence ("RFE") to RN Staff regarding the EB-2 Form I-140 immigrant petition filed by RN Staff on behalf of Dinsay, which requested evidence by November 3, 2016 (Filing No. 122 at 39; Ex. 108 at ¶¶ 14–15, 20–21; Ex. 106 at 63–65).

RN Staff clearly made known to Dinsay that it would not transfer her H-1B status, but, instead, it would immediately file for Dinsay's green card sponsorship. In November 2017, RN

---

[1] The prevailing wage rate for the physical therapist position offered to Dinsay was $78,874.00 per year. RN Staff represented on the immigration paperwork that Dinsay's offered wage was $78,874.00 per year, her offered wage equaled or exceeded the prevailing wage, and RN Staff would pay at least the prevailing wage (Ex. 107 at 3; Ex. 106 at 11, 15, 22, 34, 36).

3

Staff received a second RFE from USCIS concerning its Form I-140 immigrant petition on behalf of Dinsay. After it received the second RFE, RN Staff informed Dinsay about the RFE (Ex. 108 at ¶¶ 31, 36, 37; Ex. 106 at 61–62).

When Dinsay began receiving her paychecks, her paycheck statements indicated that she was being paid only $18.00 per hour for her "regular pay," and a sizeable portion of her weekly paycheck was paid to her through "non-taxable pay." (Ex. 105; Ex. 108 at ¶¶ 23, 25.) The W-2 forms issued by RN Staff to Dinsay indicate that Dinsay was paid $23,627.70 in 2016 and $45,083.16 in 2017 (Ex. 103). However, Dinsay's paycheck statements indicate that she was paid approximately $43,281.36 in 2016[2] and $84,174.20 in 2017, including overtime pay (Ex. 105 at 1, 6).

Dinsay discovered that she was being paid $18.00 per hour for her "regular pay," and after doing some research, she learned that the prevailing wage rate was $37.92 per hour. Dinsay believed that if RN Staff was not declaring her correct wages, the Form I-140 immigrant petition filed on her behalf could be denied, which would then make her unlawfully in the United States (Ex. 101 at 6, 9, ¶¶ 38, 57, 59; Ex. 107 at 3; Filing No. 122 at 40). After finding out that her "regular pay" was only $18.00 per hour, Dinsay continued working for RN Staff, but in March or April 2017, Dinsay called RN Staff to complain about being paid only $18.00 per hour with an additional, flexible "non-taxable pay," which she believed was neither correct nor legal (Ex. 101 at 12, ¶ 76; Filing No. 122 at 40–41, 57).

Dinsay's phone call was received by Ramon Villegas ("Villegas"), RN Staff's corporate representative with whom Dinsay previously had interacted regarding her recruitment, sponsorship, and wages. Villegas was upset with Dinsay for complaining about her wages, and he

---

[2] Dinsay had not worked a full calendar year for RN Staff in 2016 because she began work on March 25, 2016.

4

yelled at her about her pay, explaining that she was being paid the contractually agreed upon wages for her weekly net income. Dinsay was scared by Villegas's angry, yelling response. Villegas explained that he did not like "problem employees." (Ex. 101 at 12–13, ¶¶ 77–83; Filing No. 122 at 41, 57.) Villegas further explained to Dinsay, "If you continue to complain about your wages, you can forget about your immigrant petition. I can have it withdrawn or we can decide not to comply with any RFEs." (Ex. 101 at 13, ¶ 83; Filing No. 122 at 57–58.) When Dinsay asked him to not withdraw her sponsorship, Villegas responded, "Then, you better be a good employee, and just work your hours." (Ex. 101 at 13, ¶¶ 84–85; Filing No. 122 at 57–58.) Dinsay was afraid that RN Staff would carry out its threat and withdraw her Form I-140 immigrant petition sponsorship and that she would lose everything by becoming unlawfully present in the country, so she remained silent about the wage issue and continued working for RN Staff (Filing No. 122 at 41, 58–61).

Regarding a phone call during which Villegas threatened Dinsay for complaining about her wages, RN Staff and Villegas deny that any such conversation took place and deny that Dinsay was ever threatened. Villegas testified that he never yelled or shouted at Dinsay, and he never threatened her. Villegas further testified that he never threatened Dinsay's immigration status and never threatened to not comply with the RFE requests from USCIS (Filing No. 122 at 121). Dinsay never complained to Villegas about any matters related to her employment, and she never asked to change the manner in which she was paid. *Id.* at 140–41. Manuel Garcia ("Garcia"), the president of RN Staff, could not recall Dinsay ever complaining to him about any RN Staff employees, including Villegas, or complaining about the way that she was paid. *Id.* at 181. RN Staff also asserts that, contrary to Dinsay's assertion, Dinsay was paid the proper prevailing wage for her work through taxable and non-taxable pay (Filing No. 122 at 140, 161–63, 165, 171; Ex. 205 at 2, 4, 5; Ex. 210).

5

Villegas testified that no part of his professional relationship with Dinsay was contentious. He never had the impression that Dinsay was frightened or intimidated by him. Through his correspondence with Dinsay, Villegas never had the impression that she was intimidated by talking with him or that she was angry or upset with him or RN Staff. When Dinsay eventually left employment with RN Staff, Villegas had the impression that they parted on amicable and professional terms ([Filing No. 122 at 122](Filing No. 122 at 122), 132–33, 140).

Garcia could not recall any interaction with Dinsay in which he sensed that she was afraid of or intimidated by him or anyone else at RN Staff. He could not recall any interaction with Dinsay in which she seemed unhappy as an RN Staff employee. Garcia could not recall Dinsay ever making a complaint to him about any inappropriate conduct or unlawful practices. *Id.* at 182.

Dinsay voluntarily entered into her employment agreement with RN Staff. *Id.* at 78. While she was an employee of RN Staff, she possessed her own personal cell phone for which she paid, she possessed her own personal computer, she controlled her own personal e-mail address, and she controlled her own bank account. RN Staff did not force her to live in any specific home or apartment, RN Staff did not require her to be home by a certain time, and RN Staff did not dictate to whom she could talk or where she could go. Dinsay has never been to RN Staff's corporate headquarters, and she has never met in person any recruiter, supervisor, officer, or manager of RN Staff. *Id.* at 85–87.

Around April or May 2018, Dinsay completed working the contractually agreed upon 4,160 hours for RN Staff. At that time, USCIS had not yet adjudicated the Form I-140 immigrant petition filed by RN Staff on behalf of Dinsay, so the petition was still pending. However, Dinsay wanted to leave RN Staff and work for a different company. Dinsay asked the medical facility (Meadowbrook Care Center) where RN Staff had assigned her if it would hire her as a direct

employee, and the facility agreed to hire Dinsay as a direct employee. Meadowbrook Care Center discussed with RN Staff about hiring Dinsay as a direct employee (Ex. 101 at 16–17, ¶¶ 106–10).

On April 3, 2018, Dinsay sent RN Staff a resignation letter with an effective resignation date thirty days after the letter. Dinsay acknowledged in her resignation letter that RN Staff and Meadowbrook Care Center had discussed Dinsay's opportunity to work at that facility as an employee of Meadowbrook Care Center rather than as an employee of RN Staff. Dinsay also acknowledged in her letter that RN Staff had agreed to release Dinsay from her covenant to not compete and her covenant to not work for a facility where RN Staff had placed her (Ex. 206; Filing No. 122 at 72).

After RN Staff received Dinsay's resignation letter, Villegas sent a text message to Dinsay on April 5, 2018, to thank her for her service as an RN Staff employee. Villegas also asked about the possibility of talking about her future plans because RN Staff's immigration lawyer wanted that information in connection with its immigration petition (Filing No. 122 at 128; Ex. 207 at 4). Dinsay responded at the end of the day, thanking him for her work opportunity and explaining that she was out of town but would be back on Saturday. Villegas replied, "Ok. Take care. We can talk on the weekend if you want. Just shoot us a text. Thanks." (Filing No. 122 at 129; Ex. 207 at 4.) However, Dinsay did not respond to that message. *Id.*

Dinsay finished working for RN Staff on May 3, 2018 (Filing No. 122 at 61, 72, 78). When Dinsay left RN Staff, her I-140 immigrant petition and I-485 adjustment application were still pending. *Id.* at 72. On May 14, 2018, Villegas tried calling Dinsay, but she did not answer her phone, so Villegas sent another text message to Dinsay, asking, "Hi, Beth. How is your new work? Are you free to discuss the reminders of the lawyers regarding your petition? Thanks." (Filing No. 122 at 129–30; Ex. 207 at 5.) Dinsay responded later that day, explaining, "Hello. Hello, sir. Sorry

7

I was not able to answer your call. I'm doing okay at my work, sir." (Filing No. 122 at 130; Ex. 207 at 5.) Villegas replied, "Text me when you are free. Thanks." *Id.* However, Dinsay did not respond to that message. *Id.*

The following evening, on May 15, 2018, Villegas sent an email to Dinsay, expressing thanks for her service to RN Staff, asking how her new job was going, and explaining that the immigration petition needed to be ported over to her new employer. His email concluded, "We wish you the best on your career! Hope we can work with you again in the future. Thanks." (Ex. 207 at 1.) About three hours later, Dinsay responded to the email, "Thank you. Thank you, as well, sir. I would like to ask for a certificate of employment from [RN Staff]. Thank you again, sir." (Filing No. 122 at 133; Ex. 207 at 2.)

With the issue of the immigration petition still looming, on May 25, 2018, Villegas sent another text message to Dinsay: "Hi, Beth. How is your new work? Are you free to discuss the reminders of the lawyer regarding your petition? Thanks." (Filing No. 122 at 131; Ex. 207 at 5.) Dinsay did not respond. Villegas sent the same text message again on May 29, 2018, and Dinsay again did not respond. *Id.* Villegas also tried to communicate with Dinsay over the telephone during the months immediately following her resignation, but she did not answer her phone (Filing No. 122 at 133).

In September 2018, approximately four months after Dinsay's resignation, RN Staff withdrew its Form I-140 immigrant petition that it had filed on her behalf (Filing No. 122 at 72–73). On September 19, 2018, Dinsay sent an email to Villegas:

> Dear sir, Ramon, how are you? This is Beth Dinsay, one of your former PTs. Sir, I received a notification from USCIS from the [RN Staff] I-140. What is this? Notice of intent to deny or another RFE request for additional evidence. Did [RN Staff] continue to send another document that USCIS is asking for even though I have left the company? Thank you, sir. Looking forward for your response. Respectfully yours, Beth Dinsay.

(Filing No. 122 at 134; Ex. 207 at 3.)

> The following day, on September 20, 2018, Villegas responded to Dinsay's email:
>
> Hi, Beth. How are you? I hope you are doing well at work. After numerous attempts to contact you failed regarding the reminders of our attorney regarding your responsibility to port your petition with your new employer, the company went ahead and advised USCIS to withdraw your petition. We hope that your new employer is on its way to getting for you your green card. Thanks.

(Filing No. 122 at 135–36; Ex. 207 at 3.)

Prior to September 19, 2018, Dinsay had not responded substantively to any of Villegas' requests to have a discussion about porting her petition. She also never informed RN Staff that she had applied for an I-140 petition with her new employer, and she never informed RN Staff that it could withdraw its I-140 petition (Filing No. 122 at 134).

In May 2018, Dinsay began employment with Meadowbrook Care Center immediately after leaving RN Staff. Her new employer filed a new Form I-140 immigrant petition on Dinsay's behalf when she began her employment, and this new petition was approved. Thus, RN Staff's withdrawal of its Form I-140 immigrant petition in September 2018 did not affect Dinsay's ability to work in the United States (Filing No. 122 at 73–75).

On October 4, 2018, Dinsay initiated this lawsuit to assert two claims against RN Staff— violation of the TVPA and violation of 26 U.S.C. § 7434 (Filing No. 1 at 18–19). After more than two years of litigation activity, the parties filed cross-motions for summary judgment, which the Court denied, and Dinsay voluntarily dismissed her claim against RN Staff for violation of 26 U.S.C. § 7434 (Filing No. 80 at 11). On November 22, 2021, a bench trial was held on Dinsay's TVPA claim (Filing No. 121).

## II. CONCLUSIONS OF LAW

The sole claim tried during the bench trial was Dinsay's claim against RN Staff that it violated the Trafficking Victims Protection Act, 18 U.S.C. § 1589. Congress has enacted statutes to protect against "peonage, slavery, and trafficking in persons," including "forced labor." *See* 18 U.S.C. § 1589. The TVPA provides,

> Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—
>
> > (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> > (2) by means of serious harm or threats of serious harm to that person or another person;
> > (3) by means of the abuse or threatened abuse of law or legal process; or
> > (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,
>
> shall be punished as provided under subsection (d).

18 U.S.C. § 1589(a). "An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator." 18 U.S.C. § 1595(a).

The TVPA explains,

> The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

18 U.S.C. § 1589(c)(2). This statutory definition within the TVPA recognizes non-physical harm as one possible "serious harm" that can give rise to liability.

"[E]ven though the 'serious harm' that § 1589 encompasses is extremely broad it must at least pass a threshold objective standard such that it would cause a reasonable person in the victim's shoes to render forced labor." *David v. Signal Int'l, LLC*, 2012 U.S. Dist. LEXIS 114247, at *74

(E.D. La. Jan. 3, 2012). If this threshold objective standard is met, a court will then consider "whether the victim was coerced subjectively to provide labor based on the defendant's threats." *Id.*

In considering this objectively reasonable standard, courts may consider many factors such as whether the alleged victim voluntarily entered the employment arrangement; whether they voluntarily terminated the employment; whether they had a viable "exit option" and had freedom of movement; whether they had numerous opportunities to leave and were able to do so successfully without consequence; whether they had access to vehicles, phones, and the Internet; and whether they were in intolerable living conditions; as well as the alleged victim's financial status and the amount of a victim's compensation; and the alleged victim's age, experience, and education. *See Muchira v. Al-Rawaf*, 850 F.3d 605, 620–21 (4th Cir. 2017).

The Seventh Circuit has explained, "in certain contexts, threats to one's immigration status can constitute serious harm. For instance, confiscating an immigrant's passport meets this threshold. The Second Circuit has even observed that threats of deportation can, combined with other circumstances, also constitute a serious harm." *United States v. Law*, 990 F.3d 1058, 1064 (7th Cir. 2021) (internal citations omitted) (threats of serious harm occurred where passports were confiscated, and the victims were subjected to nearly constant threats of deportation).

Dinsay must prove her claim "by a preponderance of the evidence[, which] means that the trier of fact must believe that it is more likely than not that the evidence establishes the proposition in question." *In re Meyers*, 616 F.3d 626, 631 (7th Cir. 2010).

The parties dispute whether RN Staff obtained the labor or services of Dinsay by means of serious harm or threats of serious harm. Dinsay acknowledged during trial that she is not alleging physical threats or harm, but rather her TVPA claim is based upon alleged emotional or

11

psychological threats or harm (Filing No. 122 at 85–86) ("the point for my claim is not about the physical, like that I suffered, but it's emotional under the trafficking violation"). Dinsay contends that her labor was forced or compelled beginning in March or April 2017 after the allegedly threatening phone call with Villegas occurred. She contends that the forced labor continued until her employment with RN Staff ended on May 3, 2018. *Id.* at 78. During trial, Dinsay testified that after the phone call with Villegas, she did not leave RN Staff prior to May 2018 because she thought RN Staff could sue her for breach of contract and could withdraw her immigration petition. *Id.* at 88.

Dinsay has not shown by a preponderance of the evidence that RN Staff obtained the labor or services of Dinsay by means of serious harm or threats of serious harm. The Court has carefully considered all the surrounding circumstances when reaching this conclusion. While threats to one's immigration status combined with other circumstances may constitute serious harm under the statute, in this case, there is no evidence that RN Staff confiscated Dinsay's passport, and there is no evidence that Dinsay was "subjected to nearly constant threats of deportation," as was the case in *United States v. Law* where a TVPA violation was established.

Dinsay voluntarily entered into her employment agreement with RN Staff. She possessed her own personal cell phone for which she paid, she possessed her own personal computer, she controlled her own personal e-mail address, and she controlled her own bank account. Dinsay was paid her contractually agreed upon compensation, and she was compensated the prevailing wage rate when all of her compensation (taxable and non-taxable pay) was taken into consideration. Dinsay was free to live in any home or apartment of her own choosing, RN Staff did not require her to be home by a certain time, and RN Staff did not dictate to whom she could talk or where she could go. There is no evidence that RN Staff surveilled Dinsay or monitored her activities and

12

whereabouts. Dinsay is located in New York, whereas RN Staff is located in Indiana, and Dinsay never had any in-person interaction with any recruiter, supervisor, officer, or manager of RN Staff. Dinsay has never been to RN Staff's corporate headquarters.

In 2016, 2017, and 2018, Dinsay was a well-educated, experienced professional health care worker (Filing No. 122 at 107). She was not a young, inexperienced, or naïve child or adolescent. On December 17, 2016, USCIS sent a notice to Dinsay. Among other things, the notice informed Dinsay, "As a reminder, if you have an underlying Form I-140 that is approved or is still pending, you may request to change employers under INA 204(j) if your Form I-485 Adjustment application has been pending for at least 180 days." (Ex. 203 at 2.) In January 2016, RN Staff filed the Form I-140 immigrant petition on behalf of Dinsay (Ex. 106 at 8–13). RN Staff also assisted Dinsay in the simultaneous filing of Dinsay's Form I-485 adjustment application and Form I-765 employment authorization application (Ex. 108 at ¶ 12). In December 2016 when Dinsay received the USCIS notice, she had a pending Form I-140 immigrant petition, and her Form I-485 adjustment application had been pending for more than 180 days. Thus, Dinsay could have requested to change her employer and proceed with her immigration petitions with a new employer, and she was informed of this option by USCIS.

When Dinsay decided to end her employment with RN Staff, she provided a resignation letter thirty days before her last day of work. Dinsay was aware that she had a contractual covenant to not compete with RN Staff, and she knew that she had a contractual covenant to not work for a facility where RN Staff had placed her. Yet, she knew that RN Staff and Meadowbrook Care Center had discussed Dinsay's opportunity to work at that facility as an employee of Meadowbrook Care Center, and she knew that RN Staff had agreed to release her from her covenant to not compete and her covenant to not work for a facility where RN Staff had placed her. RN Staff did

not impede Dinsay's ability to end her employment with RN Staff and begin new employment with Meadowbrook Care Center.

While Dinsay testified that her claim is based upon psychological or emotional coercion, Dinsay never sought treatment for emotional distress (Filing No. 122 at 114). Under the totality of the circumstances of this case, the Court is not persuaded that an objectively reasonable person would be under such serious psychological or emotional coercion, harm, or threat of harm that would compel them to perform or to continue performing labor or services to avoid such harm. The Court concludes that the evidence does not support Dinsay's TVPA claim against RN Staff.

### III. CONCLUSION

While the Court has empathy for Dinsay and does not doubt that her experiences were stressful, she has not shown by a preponderance of evidence that RN Staff obtained her labor or services by means of serious harm or threats of serious harm. After having heard and considered testimony and evidence, the Court concludes that Defendant RN Staff Inc. is entitled to judgment on Plaintiff Beth Jeanrill L. Dinsay's claim for violation of the Trafficking Victims Protection Act.

Final judgment consistent with this Entry will issue under separate order.

**SO ORDERED.**

Date: 2/25/2022

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

Bryce H. Bennett, Jr.
RILEY BENNETT EGLOFF LLP
bbennett@rbelaw.com

Patrick Stephen McCarney
RILEY BENNETT EGLOFF LLP
pmccarney@rbelaw.com

Travis Reed Watson
RILEY BENNETT EGLOFF LLP
twatson@rbelaw.com

Christopher Terrell Lane
LANE LAW OFFICE
chrislane23@msn.com

Glenn A. Obedin
Naiburg, Obedin & Weissman, LLP
The Courthouse Corporate Center, Suite 4200
320 Carleton Avenue
Central Islip, NY 11722

Beth Jeanrill L. Dinsay
85 N. Long Beach Avenue, Apt. 4A
Freeport, NY 11520